## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER FINITZ, KYLE IRVINE, and TODD SMITH, Derivatively on Behalf of RIOT BLOCKCHAIN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN R. O'ROURKE, MICHAEL M. BEEGHLEY, JEFFREY G. MCGONEGAL, BARRY HONIG, ANDREW J. KAPLAN, JASON LES, and ERIC SO, <br><br> Defendants, <br><br> -and- <br><br> RIOT BLOCKCHAIN, INC., a Nevada corporation, <br><br> Nominal Defendant. | Case No.  1:18-cv-09640 <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs Christopher Finitz ("Finitz"), Kyle Irvine ("Irvine"), and Todd Smith ("Smith" and, collectively, "Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Riot Blockchain, Inc. ("Riot" or the "Company"), file this Verified Stockholder Derivative Complaint against John R. O'Rourke ("O'Rourke"), Michael M. Beeghley ("Beeghley"), Jeffrey G. McGonegal ("McGonegal"), Barry Honig ("Honig"), Andrew J. Kaplan ("Kaplan"), Jason Les ("Les"), and Eric So ("So" and, collectively, the "Individual Defendants" and together with Riot, "Defendants") for breaches of fiduciary duty, corporate waste, and unjust enrichment.  Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation conducted by their attorneys.  This investigation included, among other things, a review of the Company's announcements and press releases, filings made by the Company with the United

States Securities and Exchange Commission ("SEC"), corporate governance documents available on the Company's website, securities analysts' reports about Riot, and news reports and other publicly available information about the Company.

## NATURE OF THE ACTION

1.      This stockholder derivative action arises from the Individual Defendants' breaches of fiduciary duties owed to the Company, corporate waste, and unjust enrichment, which have harmed the Company's reputation and exposed Riot to hundreds of millions of dollars in liability for violations of state and federal laws.

2.      Riot is the fifth iteration of a biotechnology company that initially developed and manufactured diagnostic machinery and products ranging from in vitro diagnostics to veterinary care.  From the 2005 until 2012, the Company was named AspenBio Pharma, Inc.  In 2013, the Company's name was changed to Venaxis, Inc. ("Venaxis").

3.      In November 2016, the Company, then named Venaxis, acquired Bioptix, Inc. ("Bioptix") and, effective December 1, 2016, changed its name to Bioptix.  Shortly thereafter, Honig, an activist investor, began positioning himself and his associates to take control of the Company.  Honig acquired a significant stake in Bioptix and moved quickly to successfully replace the then existing board members with candidates of his choosing, including Beeghley and O'Rourke.

4.      After Honig and his associates gained control over the Company, in late 2017 they began to make a number of fateful changes to the Company and its business structure.

5.      The catalyst for these changes was the sudden popularity and success of cryptocurrencies.  Throughout 2017, cryptocurrencies like Bitcoin and Ethereum experienced an incredible price surge – Bitcoin experienced an exponential leap in price from less than $1,000 per share at the beginning of 2017 to nearly $20,000 per share in mid-December 2017.  In an effort to

capitalize on the enormous profits generated by the cryptocurrency wave, the Individual Defendants suddenly shifted the Company's entire business structure.

6.      In October 2017, the Company announced it was changing its name from Bioptix to Riot Blockchain, Inc. and pivoting to become a leader in blockchain technology.  The Individual Defendants immediately began to represent to the investing public that their transition to the cryptocurrency industry was an undeniable success.

7.      The Individual Defendants' timing was perfect, as investors rode the rising wave of Bitcoin through November and December of 2017.  Riot's share price reflected this strong market confidence, increasing from just $8.09 per share on October 3, 2017, to $38.60 – a staggering increase of over 377 percent in only two months.

8.      However, it was not long before information belying the Individual Defendants' repeated assurances came to light.  Far from a well-seasoned leader in blockchain technologies, Riot was merely a vehicle for the sole purpose of facilitating the Individual Defendants' access to the lucrative cryptocurrency market.

9.      On February 16, 2018, CNBC published an in-depth report which made it clear that Riot's blockchain business was not what it seemed.  The investigation raised a number of red flags about the Company, including, *inter alia*:  (i) Riot had no real involvement with the cryptocurrency or blockchain business; (ii) the Company's name change and business plan pivot were suspicious and likely to attract SEC scrutiny; (iii) Company insiders sold substantial amounts of personally held stock at suspicious times; and (iv) the relationships between some of the Company's officers and directors and defendant Honig were cause for concern.

10.     The market reaction was immediate:  Riot stock plummeted from $17.20 per share on February 15, 2018, to $11.46 on February 16, 2018, representing a market capitalization loss of over $66 million in one day.

11.     Having lost the faith and goodwill of the public as a result of the Individual Defendants' wrongdoing, the Company's share price has continued to decline since February.  Riot is now also subject to extensive litigation for which it may have to pay hundreds of millions of dollars.

12.     Even as the Company is suffering financially and otherwise, many of the Individual Defendants have come out fiscally unscathed.  A number of the Individual Defendants received more than $18 million in proceeds from their sales of Company stock based on insider information.  Others profited handsomely from their positions on the Board, in the form of compensation and other fees, which they received without justification and while they were breaching their fiduciary duties to the Company and its stockholders.

13.     The onslaught of litigation has revealed a great deal about Honig and his extensive web of suspicious and illicit business dealings.  For example, on September 7, 2018, the SEC filed a complaint in this District against Honig, O'Rourke, and others (the "SEC Complaint")[1], which includes allegations that Honig led a group of investors in a chain of highly profitable "pump-and-dump" schemes that enriched the named defendants while leaving investors with virtually worthless shares.  The SEC Complaint includes allegations that Honig has previously orchestrated schemes in which he manufactured market interest in a small or struggling company, waited for the stock price to increase, and sold his shares at a time when the stock was artificially inflated.

---

[1] *SEC v. Honig, et al.*, No. 1:18-cv-08175 (S.D.N.Y. Sept. 7, 2018).

14.     The Individual Defendants, with Honig at the helm, aggressively took control over the Company, discarded its business purpose and plan and replaced it with a veritable shell company.   After using the Company to generate substantial personal profits, certain of the Individual Defendants walked away, leaving the value and the reputation of Riot in ruins. Plaintiffs bring this action against the Individual Defendants to compensate for the harm they have caused to the Company.

## JURISDICTION AND VENUE

15.     Jurisdiction is conferred by 28 U.S.C. § 1332.   Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

16.     This Court retains general jurisdiction over each named defendant pursuant to the Company's Bylaws that contain an exclusive forum bylaw provision for a court in the state of New York.   In particular, the provision states:

ARTICLE XIV FORUM SELECTION

Forum Selection . Unless the Corporation consents in writing to the selection of an alternative forum, a state or federal court located within the State of New York shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any actions asserting a claim arising pursuant to any provision of the Nevada Revised Statutes, the Articles of Incorporation or these Bylaws, in each case as amended, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each such case subject to such court having personal jurisdiction over the indispensable parties named as defendants therein.   Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIV.

17.     Additionally, this Court has specific jurisdiction over each named nonresident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial

justice.  Finally, exercising jurisdiction over any nonresident defendant is reasonable under these circumstances.

18.    Venue is proper in this Court.  Riot's common stock trades on the NASDAQ in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Riot occurred in this District, and the Individual Defendants have received substantial compensation in this District by doing business here.

## PARTIES

### Plaintiffs

19.    Plaintiff Finitz is a current stockholder of Riot and has continuously held Riot common stock since December 21, 2017.  Finitz is a resident of New York.

20.    Plaintiff Irvine is a current stockholder of Riot and has continuously held Riot common stock since January 18, 2018.  Irvine is a resident of Virginia.

21.    Plaintiff Smith is a current stockholder of Riot and has continuously held Riot common stock since December 1, 2017.  Smith is a resident of Tennessee.

### Nominal Defendant

22.    Nominal Defendant Riot is a Nevada corporation with its principal executive offices located at 202 6th Street, Suite 401, Castle Rock, Colorado 80104.  Riot stock trades on the NASDAQ under the ticker symbol "RIOT."

### Defendants

23.    Defendant O'Rourke has been the Company's Chief Executive Officer ("CEO") since January 2017 and Chairman of the Board since November 3, 2017.  Previously, he served as a director of the Company, a position to which he was nominated by Honig, since January 2017.

According to the Company's Schedule 14A filed with the SEC on May 14, 2018 (the "2018 Proxy"), as of May 9, 2018, O'Rourke beneficially owned 257,221 shares of Riot stock or 1.9% of the Company's outstanding stock as of that date.  O'Rourke's 2017 executive compensation includes a $60,000 salary, $2,322,00 in stock awards, $609,842 in option awards which totals to $2,991,842 in compensation.  Additionally, O'Rourke sold 30,383 shares of his stock for $869,256.35 of profit while he had access to material, nonpublic information about Riot. O'Rourke is a citizen of Florida.

24.     Defendant Beeghley was Riot's CEO from April 2017 to November 2017; Chairman of the Board from January 2017 to November 2017; and a director from November 2016 to November 2017.  In 2017, Riot paid Beeghley $339,739 in compensation, including $9,000 of salary, $270,000 in stock awards, and $60,739 in option awards.  Beeghley is a citizen of Georgia.

25.     Defendant McGonegal served as the Company's Chief Financial Officer ("CFO") from June 2003 until February 2018, when the Company appointed Rob Chang ("Chang") as CFO. In 2015 and 2016, McGonegal was paid $651,207 and $513,625, respectively, in total compensation.  According to the Company's Schedule 14A filed with the SEC on March 26, 2018 (the "2017 Proxy"), effective June 30, 2017, the Company entered into a retention agreement with McGonegal providing for McGonegal's continued service as the Company's CFO and Principal Accounting Officer until April 30, 2018, at an annual base salary of $275,005.  Additionally, in 2017, McGonegal received $127,800 in stock awards, $140,000 from a non-equity incentive plan, and $169,843 in supplemental compensation.  Together with his salary, this amounts to total compensation of $709,648.  Pursuant to a modification of the retention agreement, McGonegal served solely as the Company's Principal Accounting Officer until April 30, 2018, and will

continue for four months thereafter as a consultant of the Company to provide transition services as requested by the CEO, CFO, and Board.  McGonegal is a citizen of Colorado.

26.    Defendant Honig, through his ownership of Riot securities, influence over Riot's Board of Directors (the "Board") and top executives, including O'Rourke, and continuous course of business dealings with Riot, acted as a control person of the Company throughout the relevant period as alleged herein.  Honig has reportedly helped dozens of small companies go public, primarily through mergers with the shells of failed or failing businesses, in return for significant amounts of stock or convertible notes.  Honig sold 1,583,005 shares of his stock in the Company for $17,173,646.91 in proceeds while he had access to material, nonpublic information about Riot. Honig is a citizen of Florida.

27.    Defendant Kaplan is and has been since May 2017, a director of the Company, is a member of the Audit Committee and Compensation Committee, and Chair of the Governance Committee.  In 2017, Kaplan received total compensation of $88,220, including his fees paid in cash of $8,000 and stock awards of $80,220.  Kaplan previously served on the board of directors of Majesco Entertainment Company ("Majesco") while Honig was CEO.  Kaplan is a citizen of New Jersey.

28.    Defendant Les is and has been since November 2017, a director of the Company, is a member of the Company's Audit Committee and Governance Committee, and Chair of the Compensation Committee.  According to the 2017 Proxy, Les is a professional poker player and is qualified to serve as a director "based on the fact that he has been active in the industry as a miner, studying protocol development and evaluating a variety of crypto investment strategies." Les received total compensation of $56,625 in 2017, which includes $6,000 of fees paid in cash and $50,625 of stock awards.  Les is a citizen of California.

29.     Defendant So served as a director of the Company from October 2017 until February 2018, and served as Chair of the Audit Committee and a member of the Compensation Committee and the Governance Committee.  In 2017, So was paid $65,675 in compensation, including $2,000 in fees paid in cash and $63,675 in stock awards.  So was previously the chief legal and development officer at MUNDOmedia Ltd., a company in which Honig and O'Rourke have heavily invested.  So is a citizen of Canada.

30.     Defendants O'Rourke, Beeghley, and McGonegal are referred to herein as the "Officer Defendants."

31.     Defendants Kaplan and Les are referred to herein as the "Director Defendants."

32.     Defendants Kaplan, Les, and So are referred to herein as the "Audit Committee Defendants."

33.     Defendants O'Rourke and Honig are referred to herein as the "Insider Selling Defendants."

34.     Collectively, the defendants identified in ¶¶ 23-29 are referred to herein as the "Individual Defendants."

## THE INDIVIDUAL DEFENDANTS' DUTIES

35.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise

good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

37.     As senior executive officers, directors, and/or controlling stockholders of a publicly-traded company, whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Riot's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

38.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Riot were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.      ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

39.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

40.     In addition, the Company adopted a Code of Ethics and Business Conduct (the "Code of Ethics") in October 2017 requiring that the Company's business "be conducted with honesty and integrity and in accordance with the highest ethical and legal standards" and to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Compliance with applicable governmental laws, rules and regulations;

- Full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

- The prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- Accountability for adherence to the Code.

41.     The Code of Ethics requires that the Individual Defendants comply with all applicable laws in which the Company conducts business.  The Code of Ethics specifically states:

> The Company and all Covered Persons should respect and comply with all of the applicable laws, rules and regulations of the United States and the other countries and state, local and other jurisdictions in which the Company conducts its business or in which the Company's stock is traded.  The Company is subject to legal requirements that are both numerous and complex.  All Covered Persons should understand those laws that apply to them in the performance of their jobs and take steps to ensure that the parts of the Company's operations with which they are involved are conducted in conformity with those laws.  The failure of Covered Persons to adhere to the letter and the spirit of the law could result in both personal and corporate civil or criminal liability.  Each Covered Person is personally responsible for complying with the law.  In addition, each Covered Person is charged with the responsibility of reporting to the Compliance Officer (as defined in Section 8) any behavior or conduct related to the Company's business or affairs that could reasonably constitute a criminal offense. If a Covered Person has questions or any concerns about whether his or her conduct or the conduct of others may result in personal or criminal liability, the Covered Person should seek specific guidance and advice from the Compliance Officer or from counsel, which may include the Company's counsel.

42.     The Code of Ethics also emphasizes the importance of accuracy and timeliness of financial reporting and public disclosures:

> 7. Public Reporting.
>
> As a public company, it is of critical importance that the Company's public disclosures, including filings with the Securities and Exchange Commission, be accurate and timely.  A Covered Person may be called upon to provide necessary information to assure that the Company's public disclosures are complete, fair and understandable.  The Company expects Covered Persons to take this responsibility

very seriously and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

In addition, each Covered Person must promptly bring to the attention of his or her supervisor or the Compliance Officer any information that the Covered Person may have concerning (i) significant deficiencies in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management, directors, or other Covered Persons.

43.     The Code of Ethics specifically prohibits conflicts of interest and insider trading as

a matter of Company policy.  The Code of Ethics specifically states:

Conflicts of interest are prohibited as a matter of Company policy, except under guidelines approved by the Company's board of directors. A "conflict of interest" exists when a person's private interest interferes or conflicts, or appears to interfere or conflict, with the interests of the Company or the person's duties to the Company. Conflicts of interest may also arise when a person, or members of his or her family, receives improper personal benefits as a result of his or her position in the Company or takes an action or has a personal interest that may adversely influence his or her objectivity or the exercise of sound, ethical business judgment.

*       *       *

Covered Persons are also prohibited from (a) taking for themselves personally opportunities that properly belong to the Company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the Company. Covered Persons owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

*       *       *

Prohibition on insider trading.

U.S. Federal securities laws prohibit persons with access to or knowledge of material, non-public information about the Company from buying, selling, or otherwise trading in the Company's securities. In addition, the Company has adopted a Corporate Policy and Procedure on Insider Trading which prohibits trading in the Company's securities at certain times and under certain circumstances.

44.     The Company's Corporate Policy and Procedure on Insider Trading provides guidelines with respect to trading in the Company's securities by insiders.  These guidelines explicitly prohibit employees, officers, directors, and all other insiders from trading Riot stock while in possession of material inside information.

***Additional Duties of the Audit Committee Defendants***

45.     The Audit Committee of the Board also has a charter (the "Audit Charter") that specifies the additional duties owed to the Company by the Audit Committee Defendants. According to the Audit Charter, the Audit Committee is responsible for assisting the Board with oversight of the Company's financial statements, accounting and financial reporting processes, and internal controls.  The Audit Charter describes certain tasks of the Audit Committee as follows:

1.     Review and discuss with the independent auditors the matters required to be discussed by the independent auditors under Auditing Standard No. 16, as adopted by the Public Company Accounting Oversight Board ("PCAOB") and amended from time to time, or any successor standard, rule or regulation.

2.     Discuss with management and legal counsel the status of pending litigation, taxation matters, compliance policies and other areas that may materially impact the Company's financial statements or accounting policies.

3.     Review with management and the independent auditors the effect of regulatory and accounting initiatives, as well as any off-balance sheet structures, on the Company's financial statements.

46.     The Audit Committee Defendants were required to supervise and ensure the integrity of the Company's financial statements.  The Audit Charter specifies the following tasks:

1.     Review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements (including disclosures under the section entitled Management's Discussion and Analysis of Financial Condition and Results of Operations and any report by the independent auditors related to the financial statements.

2. Based on the review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited consolidated financial statements in the Company's annual report on Form 10-K.

3. Review and discuss earnings press releases with management and the independent auditors.

4. Oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

47. Finally, the Audit Committee Defendants were required to assist the Board with oversight of internal and disclosure controls. The Audit Charter includes the following responsibilities:

1. Review and discuss the adequacy and effectiveness of the Company's internal controls, including periodically receiving reports from the Company's independent auditors and Chief Executive Officer and Chief Financial Officer regarding the Company's system of internal controls.

2. Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures, including periodically receiving reports from management regarding the Company's disclosure controls and procedures.

3. Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

48. The Audit Committee Defendants owed additional, clearly defined duties to the Company, with which they did not comply.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) deceive the investing public, including stockholders of Riot, as to the Company's operations, financial condition, and compliance policies; (ii) facilitate the Insider Selling Defendants' illicit sales of more than $18 million of their shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Riot and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of Riot was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

52.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

53.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Riot and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

*Factual Background*

54.     On September 13, 2016, Venaxis announced that it acquired Bioptix, a privately-held company based in Colorado that developed a proprietary technology platform for the detection of molecular interactions.

55.     At the time of the acquisition, Honig owned 10.04 percent of Venaxis through his company GRQ Consultants, Inc., as reported in Venaxis' Form SC 13D/A filed with the SEC on September 13, 2016.  Honig did not approve of the Company's decision to acquire Bioptix and wrote a letter to then CEO Stephen Lundy ("Lundy") pushing for the immediate reconstitution of the board.

56.     In a letter to Venaxis, attached to the September 13, 2016 Form SC 13D/A as Ex-99.4, Honig proposed "a five-person slate of new nominees" and called for a special meeting of stockholders to vote on whether to replace the current board members with his preferred candidates.

57.     Honig's five nominees included John Stetson ("Stetson")[2] Jesse Sutton ("Sutton"), O'Rourke, and Beeghley.  Stetson, Sutton, and Beeghley were all formerly associated with Majesco, now known as PolarityTE, Inc.[3]

---

[2]  Stetson is a named defendant, along with Honig and O'Rourke, in the SEC Complaint, as well as the securities class action against Mabvax Therapeutics currently pending in the Southern District of California.  *In re MabVax Therapeutics Sec. Litig.*, Case No. 3:18-cv-01160 (S.D.Ca., Jun. 4, 2018).

[3]  PolarityTE is currently subject to two securities class actions pending in the District of Utah, captioned, *Moreno v. PolarityTE et al.*, No. 2:18-cv-00510, and *Lawi v. PolarityTE, Inc. et al.*, No. 2:18-cv-00541.

58.     Honig continued to increase his holdings in Venaxis and by December 1, 2016, he had an 11.1 percent ownership stake in the company, which made him the Company's largest stockholder.

59.     On December 1, 2016, Honig again demanded a special meeting of Company stockholders to remove and replace three directors with candidates of his choice, including O'Rourke.

60.     Honig's unrelenting campaign to gain control over the board was successful.  On January 6, 2017, the Company appointed O'Rourke and Mike Dai ("Dai") as directors and as members of the Nominating and Governance, Audit, and Compensation Committees.  Following the appointment of O'Rourke and Dai, Honig-appointed directors constituted a majority of every board committee.

61.     In April 2017 Lundy resigned and on April 6, 2017 Beeghley, who was then serving as chairman of the board and a member of the Audit Committee, was appointed CEO.  As a result, Honig, having fought for Beeghley's placement as a director, became the veritable benefactor of the head of the Company.

62.     Honig's control over the Company continued to increase throughout the year and by August 21, 2017, he and his associates controlled close to thirty percent of the Company, as reflected in the following table:

| Name of Stockholder | Number of Shares Owned |
|---|---|
| Barry Honig | 543,000 |
| GRQ Consultants | 30,600 |
| Alan Honig | 20,000 |
| Mark Groussman and Melechdavid Inc. | 500,000 |
| Titan Multi-Strategy Fund I, Ltd. | 593,650 |

63.     Honig and GRQ Consultants owned 573,600 shares, or roughly ten percent of the Company.  Two members of Honig's family also owned Company stock:  Alan Honig, Honig's

father, owned 20,000 shares and Jonathan Honig, Honig's brother, owned approximately ten percent of the Company through an investment fund, Titan Multi-Strategy Fund I, Ltd. Mark Groussman, a business partner of Honig's, who is also a named defendant in the SEC Complaint, owned a total of 500,000 shares in both family trusts and his company, Melechdavid, Inc.

***Bioptix Pivots to Riot Blockchain***

64.     On September 25, 2017, the Company filed a Form 8-K with the SEC in which it stated that, effective September 19, 2017, its state of incorporation had changed from Colorado to Nevada. This was a protracted move to position to the Company for its pivot to blockchain technologies – just months before, Nevada became the first state to ban local governments from taxing blockchain use.

65.     Then, on October 3, 2017, the Company announced that its board had authorized a special cash dividend of approximately $1.00 per common share to be paid to the Company's stockholders of record as of October 13, 2017. The cash dividend was paid on October 18, 2017 and totaled approximately $9,562,000.

66.     The board's approval of this dividend was baffling given the Company's deficit of more than $120 million as of September 30, 2017. Furthermore, Riot had cash and cash equivalents of only $13 million and no significant sources of revenue.

67.     Soon after, on October 4, 2017, the Company issued a press release announcing that it would change its name to Riot Blockchain, Inc., in conjunction with a drastic pivot in business strategy to investing in and operating blockchain technologies. Beeghley spoke confidently about Riot's future prospects in the press release, stating that the Company had "the insight and network to effectively grow and develop blockchain assets." Riot also announced that it had already invested in goNumerical Ltd. (dba "Coinsquare"), "one of Canada's leading exchanges for trading digital currencies." The press release stated in relevant part:

Bioptix Inc. (Nasdaq: BIOP) today announced it is changing its name to Riot Blockchain, Inc., and has reserved and plans to change its Nasdaq ticker symbol to RIOT, in line with a shift in direction of the company. The name and symbol change are subject to Nasdaq approval. Moving forward, Riot Blockchain's focus will be as a strategic investor and operator in the blockchain ecosystem with a particular focus on the Bitcoin and Ethereum blockchains.

As part of this focus, the company announces it has made a strategic investment in Coinsquare Ltd., one of Canada's leading exchanges for trading digital currencies. This investment into a blockchain-focused company is indicative of similar opportunities Riot Blockchain plans to pursue, including possible acquisitions of businesses serving the blockchain ecosystem.

"At Riot Blockchain, our team has the insight and network to effectively grow and develop blockchain assets," said Michael Beeghley, Chief Executive Officer of Riot Blockchain. "With new applications being developed for blockchain every day, this is a rapidly growing and evolving market. We are excited to have partnered with and led an investment in Coinsquare, a company we believe is well positioned to capitalize on the opportunity in this sector."

68.     On October 5, 2017, Riot filed a Form 8-K with the SEC with an attached "Investor Presentation" expounding on the incredible value of the cryptocurrency business and the important role Riot would play, "[a]s first mover as [a] NASDAQ listed pure play Blockchain company."

69.     Then, on October 17, 2017, Riot announced that it had completed yet another acquisition. The Company entered into a purchase agreement to acquire 52 percent ownership in another Canadian company, Tess, Inc. ("Tess").[4]  Tess was a developer of blockchain-based payment services for wholesale telecom carriers. In the press release announcing the acquisition,

---

[4] Honig was the intermediary who introduced O'Rourke to Lee Ann Wolfin, the head of Cresval Capital Corp., a mining company into which Tess was planning to merge. Her late father, Arthur Wolfin, was Cresval Capital's founder and chief executive. He also headed Levon Resources Ltd., another mining company that did deals with two other companies whose stockholders included Honig, O'Rourke, Michael Brauser and Philip Frost. Levon owned a large chunk of Pershing Gold Corp., and also did a reverse merger with SciVac Therapeutics Inc. (now part of VBI Vaccines, a third company backed by Honig and Philip Frost. Chris Carey, *Cool Mara Riot, Part Two: Securities-fraud case against South Florida group reverberates through additional companies*, http://sharesleuth.com/investigations/2018/09/cool-mara-riot-part-two-securities-fraud-case-against-south-florida-group-reverberates-through-additional-companies (Sept. 25, 2018).

Beeghley was quoted as saying, "The telecom payment platform of TESS is a prime example of how blockchain-based technologies can be leveraged to disrupt established industries. I believe that Riot Blockchain is poised to take advantage of this revolution in digital transactions as we see increasing adoption of blockchain protocols in our everyday lives."

70.     Riot's October 27, 2017 Form 8-K filed with the SEC revised the size of Riot's market opportunity from $150 billion to $170 billion as a result of the aforementioned acquisitions.

71.     In a November 2, 2017 press release, the Company announced that it had entered into an agreement to acquire cryptocurrency mining equipment to assist with its blockchain technology expansion.

72.     On November 13, 2017, despite the Company's substantial purchasing spree, the Company's Form 10-Q for the period ended September 30, 2017, (the "Q3 2017 Form 10-Q") revealed that Riot was without revenue and its financial situation was unlikely to improve. The Q3 2017 Form 10-Q explained that, "[t]he Company has experienced recurring losses and negative cash flows from operations," and "expects to continue to incur losses from operations for the near-term" which could be significant. The Q3 2017 Form 10-Q also described the Company's history of losses and identified a number of risk factors that could affect the Company's ability to continue as a going concern. According to the Q3 2017 Form 10-Q:

> General Risks
>
> We have a history of operating losses, and we may not be able to achieve or sustain profitability; we have recently shifted to an entirely new business and may not be successful in this new business.
>
> We are not profitable and have incurred losses since our inception. We expect to continue to incur losses for the foreseeable future, and these losses could increase as we continue to work to develop our business. We were previously engaged in veterinary and life science-oriented businesses and were not successful in those businesses. In late 2017, we determined to instead pursue a blockchain and digital currency-related business, initially through investments in existing companies. Our initial efforts in this new business will focus primarily on bitcoin mining and the

establishment of a cryptocurrency exchange and a futures brokerage operation. Currently, however, our only operations are at our bitcoin mining facility ("mine") in Oklahoma, and that mine is still in a relatively early stage of development. Our current strategy is new and unproven, is in an industry that is itself new and evolving, and is subject to the risks discussed below.  This strategy, like our prior ones, may not be successful, and we may never become profitable.  Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods.

Our costs are growing rapidly, which could seriously harm our business or increase our losses.

Our mining operations are costly, and we expect our expenses, including those related to acquisitions, to grow in the future.  This expense growth will continue as we broaden our network of computers to mine ("miners"), as we develop and implement an exchange feature, which will require more computing infrastructure, and as we hire additional employees to support potential future growth.  Our costs will be based on development growth of operations and may not be offset by a corresponding growth of our revenue.  We plan to continue to invest in our infrastructure to take advantage of various opportunities, potentially in countries and in activities where we do not expect significant short-term monetization, if any. Our expenses may be greater than we anticipate, and our investments to make our business more efficient may not succeed and may outpace monetization efforts.  In addition, we expect to incur marketing and other operating expenses to grow and expand our operations and to remain competitive.  Increases in our costs without a corresponding increase in our revenue would increase our losses and could seriously harm our business and financial performance.

*       *       *

We have an evolving business model.

As cryptocurrency assets and blockchain technologies become more widely available, we expect the services and products associated with them to evolve.  In order to stay current with the industry, our business model may need to evolve as well. From time to time, we may modify aspects of our business model relating to our product mix and service offerings.  We cannot offer any assurance that these or any other modifications will be successful or will not result in harm to our business. We may not be able to manage growth effectively, which could damage our reputation, limit our growth and negatively affect our operating results.  Such circumstances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations.

*       *       *

22

Cryptocurrency-Related Risks

Regulatory changes or actions may alter the nature of an investment in us or restrict the use of cryptocurrencies in a manner that adversely affects our business, prospects or operations.

As cryptocurrencies have grown in both popularity and market size, governments around the world have reacted differently to cryptocurrencies, with certain governments deeming them illegal and others allowing their use and trade but, in some jurisdictions, such as in the U.S., subject to extensive, and in some cases overlapping, regulatory requirements, as well as unclear and evolving requirements.  Ongoing and future regulatory actions may impact our ability to continue to operate, and such actions could affect our ability to continue as agoing concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations.

Our change in our business strategy and name could subject us to increased SEC scrutiny.

We previously were engaged in veterinary- and life science-oriented businesses (as a diagnostics company and then a research tools company), under the name Bioptix. In late 2017, we determined to instead pursue a blockchain and digital currency (specifically bitcoin)-related business, initially through investments in existing companies.  The SEC has announced that it is scrutinizing public companies that change their name or business model in a bid to capitalize upon the hype surrounding blockchain technology, and has suspended trading of certain of such companies.  SEC Chairman Jay Clayton warned that it is not acceptable for companies without a meaningful track record in the sector to dabble in blockchain technology, change their name and immediately offer investors securities without providing adequate disclosures about the risks involved.  As a result, we could be subject to substantial SEC scrutiny that could require devotion of significant management and other resources and potentially have an adverse impact on the trading of our stock.

*     *     *

Acceptance and/or widespread use of cryptocurrency is uncertain.

Currently, there is a relatively limited use of any cryptocurrency in the retail and commercial marketplace, thus contributing to price volatility that could adversely affect an investment in our securities.  Banks and other established financial institutions may refuse to process funds for cryptocurrency transactions, process wire transfers to or from cryptocurrency exchanges, cryptocurrency-related companies or service providers, or maintain accounts for persons or entities transacting in cryptocurrency.  Conversely, a significant portion of cryptocurrency demand is generated by investors seeking a long-term store of value or speculators seeking to profit from the short- or long-term holding of the asset.  Price volatility

undermines any cryptocurrency's role as a medium of exchange, as retailers are much less likely to accept it as a form of payment. Market capitalization of a cryptocurrency as a medium of exchange and payment method may always be low.

The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace, or a reduction of such use, limits the ability of end users to use them to pay for goods and services. Such lack of acceptance or decline in acceptances could have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which could have a material adverse effect on our business, prospects or operations and potentially the value of bitcoin or any other cryptocurrencies we mine or otherwise acquire or hold for our own account.

\*       \*       \*

We face risks from the lack of clarity in the corporate governance of many cryptocurrency systems.

Lack of clarity in the corporate governance of many cryptocurrency systems may lead to ineffective decision making that slows development or prevents a network from overcoming important obstacles. Governance of many cryptocurrency systems is by voluntary consensus and open competition. To the extent lack of clarity in corporate governance of cryptocurrency systems leads to ineffective decision making that slows development and growth, the value of our securities may be adversely affected.

73.   On November 16, 2017, three days after the cautionary Q3 2017 Form 10-Q was filed, the Company issued a press release announcing that Riot made a strategic investment in Verady, LLC, "to further advance its technology and increase the size of its team." In connection with the strategic investment, O'Rourke stated:

"This investment continues our commitment to building blockchain technologies . . . With recent highs in Bitcoin and other cryptocurrency valuations, there is significant market potential for blockchain and digital asset technologies. We will continue to increase our involvement and support of the blockchain ecosystem, as we ramp up our Bitcoin mining operations."

74.   On December 19, 2017, Riot announced a $37 million private placement, the proceeds of which were to be used for "the expansion of the Company's Bitcoin mining operations, strategic investments, and general working capital."

75.    Then, in a December 27, 2017 press release titled, "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders," the Company cancelled the Annual Meeting twenty-four hours before it was scheduled to occur.  The press release stated in relevant part:

> Riot Blockchain, Inc. (Nasdaq: <u>RIOT</u>) (the "Company") today announced that its 2017 Annual Meeting of Stockholders scheduled for December 28, 2017 (the "Annual Meeting"), was adjourned to achieve a quorum on the proposals to be approved.

> The Annual Meeting has been adjourned to 10:00 a.m. Eastern Standard Time on Thursday, February 1, 2018, at the Boca Raton Resort and Club, 501 East Camino Real, Boca Raton, FL33422, to allow additional time for the Company's stockholders to vote on proposals to approve the following:

> 1.    To elect as directors the nominees named in the proxy statement;

> 2.    To ratify the appointment of EisnerAmper LLP as our independent public accountant for the fiscal year ending December 31, 2017;

> 3.    To advise us as to whether you approve the compensation of our named executive officers (Say-on-Pay); and

> 4.    To approve an amendment to the Company's 2017 Equity Incentive Plan to increase the reservation of common stock for issuance thereunder to 1,645,000 shares from 895,000 shares.

76.    This postponement was a cause for stockholder concern as reflected by the market's reaction:  Riot's stock fell from $31.22 per share on December 26, 2017, to close at $27.23 per share on December 28, 2017, eliminating over $38 million in market capitalization in two days.

77.    However, on January 31, 2018, the day before the rescheduled Annual Meeting of Stockholders was set to take place, the Company issued a second press release titled, "Riot Blockchain Announces Adjournment of Annual Meeting of Stockholders," which yet again cancelled the Annual Meeting without providing any satisfying reason:

> Riot Blockchain, Inc. (Nasdaq: RIOT) (the "Company") today announced that its 2017 Annual Meeting of Stockholders (the "Annual Meeting") was adjourned for a second time to achieve a quorum on the proposals to be approved. Under Nevada law, a new record date is required to be set.

> The Company will file and mail a new proxy statement to its shareholders of record as soon as practical after its Board of Directors approves the new record date and schedules a new date and time for its Annual Meeting.

78.     On February 6, 2018, in what was likely a thinly veiled reference to Riot, Chairman of the SEC, Jay Clayton, expressed skepticism about companies that suddenly change their names and/or business models to take advantage of the profits associated with the growth of virtual currencies, stating:

> I also have been increasingly concerned with recent instances of public companies, with no meaningful track record in pursuing distributed ledger or blockchain technology, changing their business models and names to reflect a focus on distributed ledger technology without adequate disclosure to investors about their business model changes and the risks involved.

### The CNBC Investigation

79.     On February 16, 2018, CNBC published an article titled "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket." The article provided the public with the first in-depth look into the suspicious nature of the Company's exponential and improbable expansion.

80.     The article called attention to a number of the Company's questionable business decisions, such as the drastic pivot to blockchain and the postponement of stockholder meetings, stating:

> As bitcoin hit record highs in late December, a hot new stock was making news on a daily basis. Riot Blockchain's stock shot from $8 a share to more than $40, as investors wanted to cash in on the craze of all things crypto.

> But Riot had not been in the cryptobusiness for long. Until October, its name was Bioptix, and it was known for having a veterinary products patent and developing new ways to test for disease.

> The company did make an investment in a cryptocurrency exchange in September and two months later did purchase a company that has cryptocurrency mining equipment, but paying more than $11 million for equipment worth only $2 million, according to SEC filings.

That purchase and the company's name change aren't Riot's only questionable moves.

A number of red flags in the company's SEC filings also might make investors leery: annual meetings that are postponed at the last minute, insider selling soon after the name change, dilutive issuances on favorable terms to large investors, SEC filings that are often Byzantine and, just this week, evidence that a major shareholder was getting out while everyone else was getting in.

\*       \*       \*

Despite Riot Blockchain's latest quarterly report showing a company in the red, its annual meeting was twice set to take place at the swanky Boca Raton Resort and Club in Florida. The resort is known as the "pink palace" and has luxury yachts lined up on its dock.

But with less than one day's notice, Riot twice "adjourned" its annual meeting, first scheduled for Dec. 28 and then for Feb. 1. It's not clear the company ever planned to have the meeting. Numerous employees at the hotel told CNBC it had no reservations for either date under the name of Riot Blockchain or any affiliated entity.

81.     The article's suggestion that Honig was the driving force behind the Company's

questionable practices was hardly conspicuous.  The article stated:

Riot's filings reveal that Barry Honig may be the man behind the Riot Blockchain curtain.

That would explain why a company formerly headquartered in Colorado might suddenly host its annual meeting in Boca Raton.  That sunny location would certainly be convenient for Honig, once the company's largest shareholder, whose office is a short drive from the hotel.  He once owned more than 11 percent of the outstanding common stock, according to SEC filings.

"My history of investing's pretty good. I invest in public companies," Honig told CNBC by phone.  "It was an investment where I had a return.  And I sold some shares.  There's nothing wrong with doing that."

Honig became active in Riot in April 2016 when it was a veterinary testing company with a different name. He led an activist campaign to replace the board in September 2016 and won the fight in January 2017.

After his victory, attorneys say, red flags began to appear.

Until January, Honig had an extensive website filled with fawning descriptions of his investment acumen and what he does for companies when he gets involved.

27

"Barry Honig's investment portfolio includes a variety of exciting technology and biotech companies focused on innovation and progress," barryhonig.com stated before it was taken down.

"Typically, Barry Honig invests his hard-earned money into a company, and he also provides strategic guidance to the company pertaining [sic] a variety of aspects, including who should lead the company (he helps put the right people in the right places in most of his investments), what goals and timelines that company should work towards, and a plan for the best way to achieve those goals," the website said.

A visit to the site now only reveals the text: "Under construction."

82. Furthermore, according to the article, upon entering Honig's Florida-based offices, the CNBC crew found O'Rourke, rather than Honig:

> That's the same O'Rourke who made headlines when — less than three months after the company changed names and business plans — he sold about $869,000 worth of shares, according to an SEC filing.  He told the crew he was there for a meeting with Honig and that we had just missed him.

> O'Rourke initially agreed to a formal interview with CNBC and emailed later to say the interview was "confirmed," adding "I think you'll be impressed."  Then, late the night before, he backed out via email and said he needed to go to the Midwest to close an acquisition.

> He agreed to answer questions via email instead.  One of CNBC's first questions was whether he worked in the same office as Honig, which could raise eyebrows.

> Securities attorneys told CNBC that if a CEO were using the office of a major investor, it might raise concerns about the exchange of information.

> "You just can't imagine that the CEO and the investor are going to have an appropriate wall between them where they're not engaging in discussions or dialogue about what's appropriate for the company on a day to day basis or in the future," said Richard Birns, a corporate partner at Gibson, Dunn & Crutcher LLP.

83. The article quotes Honig as claiming that he was not involved in the decision to appoint O'Rourke as CEO.  In fact, Honig had campaigned for O'Rourke's appointment to the Board since 2016.  Additionally, Honig neglected to mention that he was instrumental in advocating for Beeghley's initial placement on the Board:

> Despite Honig's website saying he gives advice on who should lead a company, Honig said he had nothing to do with O'Rourke becoming CEO.

"The board and Michael Beeghley [the CEO before O'Rourke] are the ones that made the decision in regards to John O'Rourke becoming the CEO, okay? John O'Rourke doesn't work for me, okay?" he said.

84.     The investigation also included details about O'Rourke and Honig's prior dealings

in the cryptocurrency sector.  The article stated:

Riot is not O'Rourke and Honig's first cryptocurrency investment.

In 2013, they were owners in BTX Trader, a cryptocurrency company, which was acquired by WPCS, a publicly traded company in which Honig had invested, according to court records.

WPCS bought BTX on Dec. 17, 2013, just 13 days after it was incorporated in Delaware, according to SEC filings.

At the time, WPCS was a communications, infrastructure and contracting company. The stock went up to $435.60 on a split-adjusted basis. It's now trading around $2 after selling off BTX Trader in 2015, according to SEC filings.

Just last month, the company changed its name to DropCar after a merger and is now a cloud-services-for-cars company.

O'Rourke, through his lawyer, told CNBC in an email that he made several investments with Honig as co-investor.  "BTX Trader was one of our first investments together in the blockchain sector in 2013," he said.  "I have a good relationship with Mr. Honig, and he has been a supportive shareholder of Riot."

Honig acknowledges the investment.

85.     The article went on to quote multiple securities experts who expressed serious

concerns about Riot's business structure and associated red flags:

Birns analyzed Riot Blockchain's SEC filings for CNBC and found additional concerns.

"I see a company that has had a change of control of the board.  I see a company that has had a change in business.  I see a company that has had several dilutive issuances immediately following the change of the board and change of the business. And I see a stock that has gone zoom," he said.  "And what I understand [is] a significant amount of insider selling. So yes, these are red flags."

Jacob Zamansky, founder of Zamansky LLC, which specializes in securities fraud, also expressed caution.

"With the absence of revenue on the company's current financial statements, I would think investors need to be very cautious of a highly speculative stock with a lot of red flags," he said.

86.     Other questionable practices highlighted in the article include the October 2, 2017, dividend payout of $9.5 million, the timing of Honig's trades, and Riot's drastic overpayment for bitcoin mining machines.   The article stated in relevant part:

Since Honig's board shake-up, the company has increased its common stock share count from 4.5 million to more than 11.6 million.   On Oct. 2, 2017, two days before announcing the name change to Riot Blockchain, the board approved a dividend payout of more than $9.5 million, according to SEC filings.

Investors who own more than 5 percent of a company's outstanding common stock are required to file a form known as a 13D, which outlines their holdings. Subsequent changes in holdings require a "timely" filing of any changes.

SEC records spanning 14 months show that Honig filed two 13Ds, including one in January 2017 that shows he owned 11.19 percent.   After Riot's name change sent the company's shares soaring, Honig cashed out and filed the second 13D in February showing he owned less than 2 percent of outstanding common stock along with a small number of warrants.   His purchase price ranged from $2.77 to $5.32 per share, according to the list of trades he provided to the SEC in 2017.   Honig's investment dropped below 5 percent, the threshold for SEC filing, on Nov. 28.   At that point, the stock had already climbed above $20.

Honig did not disclose his dramatically reduced position in the stock until this week.

*     *     *

Birns questioned how Honig made his filings.   "It's clear that Mr. Honig, through himself and through the entities that he controls, owns at least a significant amount of stock.   Or has the potential to own [a] significant amount of stock in excess of what is reported on the 13D," he said.

This is not the first time Honig has faced questions over his actions.   In 2000, he was alleged to have committed stock manipulation.   Honig was fined $25,000 and suspended for 10 days, according to the Financial Industry Regulatory Authority. In 2003, he let his broker's license lapse.

"The answer's no," Honig said when asked if he still manipulates stocks.

SEC filings suggest that when Honig began his charge to take over the board, he was represented by lawyer Harvey Kesner of Sichenzia Ross Ference Kesner LLP. A few months later, Kesner's law firm appears on Riot Blockchain's SEC filings.

Kesner's company, Paradox Capital Partners LLC, owns Riot stock, according to SEC filings.  When reached by phone, Kesner said he didn't know anything about Riot Blockchain and Barry Honig and hung up.

Honig said Kesner was Riot's attorney, but "his law firm has represented me in other issues in the past."

*       *       *

Since its name change, Riot has been a very active company, issuing 23 press releases about acquisitions and new divisions.

One of those acquisitions was Kairos Global Technology Inc., which had been founded less than two weeks before the purchase. Kairos' main asset was $2 million of mining equipment.  Riot purchased Kairos for $11.9 million worth of preferred convertible stock, according to SEC filings.

O'Rourke told CNBC the company paid a premium for the equipment due to a shortage of mining equipment and difficulties getting it directly from the manufacturer.

Kairos appears to have many links to Riot.  The company was incorporated by Joe Laxague of Laxague Law Inc., the same lawyer who, SEC filings suggest, represented another major investor in Riot who has owned more than 7.49 percent of the company.

Laxague told CNBC he could not comment when reached by phone and hung up.

Kairos' president was Michael Ho, Nevada records show, a poker player who played at a tournament with two other professional poker players, both of whom are on Riot's advisory board, according to records reviewed by CNBC.

O'Rourke said Riot is using the equipment to mine and that the company is currently mining in Norway and Canada.  Despite the many press releases, there has been no formal mining announcement.

"We have launched our own Bitcoin mining operation and it will be a focal point for Riot's expansion plans moving forward," is all Riot says on its webpage dedicated to mining. SEC filings are silent on mining activity.

As for professional poker players advising Riot?  O'Rourke told CNBC the players are investors in the cryptocurrency space with more than 50,000 social media followers. He called them "thought leaders."

87.     The CNBC article had a devastating effect on Riot's shares.  The Company's stock plummeted from $17.20 per share on February 15, 2018, to $11.46 on February 16, 2018, representing a $66 million loss in market capitalization in a single day.

**Insider Sales by Defendants Honig and O'Rourke**

88.     After taking action to improperly inflate the price of Riot's stock, Honig and O'Rourke sold their personal holdings in the Company on the basis of their particular knowledge of Riot's material, nonpublic information.  As Company insiders, and architects of the artificial inflation scheme, Honig and O'Rourke were privy to material, nonpublic information about the Company's true value and prospects.  In total, O'Rourke and Honig sold over $18 million worth of stock at artificially inflated prices.

89.     Honig sold 1,583,005 shares of his personally held the Riot stock for total proceeds of $17,173,646.91.  Honig strategically timed his sales to maximize profit he received as a result of the Individual Defendants' scheme to artificially inflate Riot's stock price.  In the five months leading up to Riot's name change on October 4, 2017, Honig sold 13.76% of his stock.  Then, following the improper statements made on October 3, 2017, the Company's stock price steadily rose from a low of $8.09 per share to an incredible close of $38.60 per share on December 19, 2017, representing a 377% increase in less than three months.  Honig's sales are suspicious given that his stock sales represented 98% of his holdings.

90.     O'Rourke sold 30,383 shares of his personally held Riot stock for proceeds of $869,256.35.  O'Rourke's strategically timed his sales to maximize profit he received as a result of the Individual Defendants' scheme to artificially inflate Riot's stock price.  Then, following the improper statements made on October 3, 2017, the Company's stock price steadily rose from a low of $8.09 per share to a close of $38.60 per share on December 19, 2017, representing a 377% increase, before beginning to fall in January 2018.  O'Rourke did not sell any stock prior to October

4, 2017.  However, after the Company's stock skyrocketed and only days before it began to fall, O'Rourke sold nearly 30% of his total holdings.

## DAMAGES TO RIOT

91.     As a result of the Individual Defendants' wrongful conduct, Riot disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Riot's credibility.  Specifically, the Company's market capitalization has decreased by $310 million, or 83 percent, from its high in December 2017.  Riot has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

92.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Riot to a lawsuit for violations of the federal securities laws pending in various courts, captioned *Creighton Takata v. Riot Blockchain, Inc. et al.*, Case No. 3:18-cv-02293; *Roys v. Riot Blockchain, Inc. et al.*, Case No. 9:18-cv-80225-BB; *Joseph J. Klapper, Jr. v. Riot Blockchain, Inc. et al.*, Case No. 3:18-cv-8031; and *Everson v. Riot Blockchain, Inc.*, Case No. 1:18-cv-01292 (collectively, the "Securities Class Actions").

93.     In addition to the Securities Class Actions pending against Riot, there are many actions pending in which Honig and others are implicated in similar wrongdoing.  This association, coupled with the Company's tainted reputation, will create a shadow over Riot which will undoubtedly have a negative impact on investors' and creditors' willingness to take a chance on Riot in the future.

94.     As a direct and proximate result of the Individual Defendants' actions, Riot stands to expend millions of dollars.  Such expenditures include, *inter alia*, the costs incurred from: (i) defending the Securities Class Action Suits, including any associated settlement fees; (ii)  the costs incurred from the SEC investigation; (iii) carrying out internal investigations of wrongdoing;

and (iv) the excessive compensation and benefits that were paid to the Individual Defendants while they were breaching their fiduciary duties to the Company.

95.     Moreover, these actions have irreparably damaged Riot's corporate image and goodwill.  For at least the foreseeable future, Riot will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Riot's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFFS' DERIVATIVE AND DEMAND ALLEGATIONS

96.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

97.     Plaintiffs bring this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof by each of the Individual Defendants.

98.     Plaintiffs are owners of Riot common stock and were owners of Riot common stock at all times relevant hereto.

99.     Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

100.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Riot Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

101.   At the time this action was commenced, the Board was comprised of just three individuals:  defendants Kaplan and Les, and nondefendant Remo Mancini ("Mancini").  Demand is futile as to defendants Kaplan and Les, and is therefore excused.

**Demand is Excused as to Defendants Kaplan and Les as They Face a Substantial Likelihood of Liability for Their Wrongdoing**

102.   The Individual Defendants face a substantial likelihood of liability for their individual misconduct.  Specifically, Kaplan and Les, while serving as directors, made false and misleading statements in the Company's SEC filings and press releases, regarding:  (i) the extent and quality of Riot's investment in cryptocurrency and blockchain products and technology; (ii) the location of Riot's principal executive offices; (iii) the Company's Annual Meeting on December 28, 2017, and subsequently rescheduled to February 1, 2018; and (iv) the adequacy of Riot's internal controls over financial reporting.  As directors, Kaplan and Les had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

103.   As the ultimate decision-making body of the Company, the Board allowed the Company to engage in the schemes alleged herein.  The fraudulent scheme was carried out in an effort to artificially inflate the value and potential of the Company thereby allowing the Individual Defendants to take advantage of a profitable market trend.  In knowingly or recklessly participating in the scheme, Kaplan and Les completely abdicated their fiduciary duties as directors of the Company.

104.   Moreover, especially in light of their positions on the Board's Audit Committee, Kaplan and Les owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust

and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, Kaplan and Les knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Riot.

105.    Kaplan and Les' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties have resulted in Kaplan and Les facing a substantial likelihood of liability. If Kaplan and Les were to bring a suit on behalf of Riot to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**Demand on Defendant Kaplan is Futile Due to his Business and Personal Relationships**

106.    Kaplan is inextricably linked with Beeghley, Honig, and O'Rourke through years of business collaborations, and is thus incapable of impartially considering a demand to commence and vigorously prosecute this action.

107.    Kaplan has served on the Board since May 2017. He is Chairman of the Nominating and Governance Committee and a member of the Audit and Compensation Committees. Kaplan held Company stock valued at approximately $152,000, before the fraud was exposed and clearly has an interest in maintaining a high stock price for Riot so as not to decrease the value of his holdings.

108.     Before serving on the Board of Riot, Kaplan served on the board of directors of Majesco, an interactive entertainment-based Delaware corporation.   Honig was the CEO of Majesco before Philip Frost helped to orchestrate the company's reverse merger with the biotechnology firm, PolarityTE, Inc.   Kaplan was named a director of Majesco on October 2, 2015, the same day that Honig was appointed CEO.[5]

109.     Kaplan is also a director of U.S. Gold Corporation, a company in which Honig is a major investor.

110.     Given the extensive, and long-standing business relationships between Kaplan, Honig, and Beeghley, it is highly unlikely that Kaplan would vote to initiate litigation against the other Individual Defendants, especially Honig.   Kaplan is incapable of independently and impartially considering a demand to commence and vigorously prosecute this action and demand is therefore futile as to Kaplan.

## COUNT ONE

### Against the Individual Defendants
### for Breach of Fiduciary Duties

111.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

112.     The Individual Defendants each owed Riot and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.

113.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Riot.

---

[5]   Michael Brauser, a named defendant, and alleged co-conspirator of Honig, in the SEC Complaint, was also named a director of Majesco on October 2, 2015.

114.    The Individual Defendants breached their fiduciary duties owed to Riot and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee Riot's business and caused the Company to fail to maintain internal controls, rendering them personally liable to the Company.

115.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding such substantial and long-running illegal activity.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that:  (i) the Company lacked a meaningful business plan with respect to its cryptocurrency business; (ii) Riot had minimal investments in cryptocurrency products; (iii) the Company changed its name from Bioptix to Riot Blockchain merely as a stunt to fraudulently avail itself of the profits caused by the current cryptocurrency wave and artificially inflate its stock price; (iv) Riot's principal executive offices were located in Florida, where defendant Honig was also located and exercised undue influence over the Company's management; (v) Riot never intended to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (vi) the Company failed to maintain adequate internal controls.  Accordingly, the Officer Defendants breached their duty of care and loyalty to Riot.

116.    The Director Defendants, as directors of the Company, owed and owe Riot the highest duty of loyalty.  The Director Defendants breached their duty of loyalty by causing or allowing defendants to make improper statements in the Company's press releases and public filings concerning the Company's blockchain operations, location, Annual Meeting, and relationships with Company insiders.  The Director Defendants knew or were reckless in not knowing that:  (i) the Company lacked a meaningful cryptocurrency business plan; (ii) Riot had

minimal investments in cryptocurrency products; (iii) the Company changed its name from Bioptix to Riot merely as a stunt to fraudulently avail itself of the profits caused by the current cryptocurrency wave and artificially inflate its stock price; (iv) Riot's principal executive offices were located in Florida, where defendant Honig was also located and exercised undue influence over the Company's management; (v) Riot never intended to hold its Annual Meeting scheduled for December 28, 2017 and rescheduled for February 1, 2018; and (vi) the Company failed to maintain adequate internal controls.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

117.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely failed in their duty of oversight, and failed to uphold their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

118.    The Insider Selling Defendants breached their duties of loyalty by selling Riot stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was proprietary, nonpublic information concerning the Company's future business prospects, which the Insider Selling Defendants used for their own benefit when they sold Riot common stock.

119.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, candor and due care, as alleged herein, Riot has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT TWO

### Against the Individual Defendants
### for Unjust Enrichment

120.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

121.    By their wrongful acts and false and misleading statements and omissions of material fact, the Individual Defendants were unjustly enriched at the expense and to the detriment of Riot.

122.    The Individual Defendants either benefitted financially from the improper conduct by, (1) receiving unjustly lucrative bonuses tied to the false and misleading statements, (2) receiving bonuses, stock options, or similar compensation from Riot that was tied to the performance or artificially inflated valuation of Riot, or (3) receiving compensation that was unjust in light of the Individual Defendants' bad faith conduct.

123.    Plaintiffs, as stockholders and representatives of Riot, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits obtained by the Individual Defendants resulting from their wrongful conduct and breach of fiduciary duties.

## COUNT THREE

### Against the Individual Defendants
### for Waste of Corporate Assets

124.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

125.    By their wrongful acts and material misstatements and/or omissions described herein, the Individual Defendants have wasted Riot's corporate assets by forcing the Company to expend much needed, valuable assets in defending the securities class actions.

40

126.     The Individual Defendants have also caused the Company to waste its assets on the inordinately large sums paid to certain officers and directors while they were breaching their fiduciary duties to Riot.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Declaring that Plaintiffs may maintain this derivative action on behalf of Riot and that Plaintiffs are proper and adequate representatives of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  October 22, 2018                    Respectfully submitted,


**BRAGAR EAGEL & SQUIRE, P.C.**

By:  *Melissa A. Fortunato*
Marion Passmore
Melissa A. Fortunato (MF0214)
Shaelyn Gambino-Morrison
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
fortunato@bespc.com
gambino-morrison@bespc.com

*Attorneys for Plaintiffs*

## VERIFICATION

I, Christopher Finitz, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint; that I have reviewed the Verified Stockholder Derivative Complaint; and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATED: October ___, 2018

Christopher Finitz (Oct 18, 2018)

Christopher Finitz

**VERIFICATION**

I, Kyle Irvine, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint; that I have reviewed the Verified Stockholder Derivative Complaint; and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATED: October __, 2018

Kyle Irvine (Oct 19, 2018)

Kyle Irvine

## VERIFICATION

I, Todd Smith, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint; that I have reviewed the Verified Stockholder Derivative Complaint; and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATED: October __, 2018

*Todd R.J. Smith*
Todd R.J. Smith (Oct 18, 2018)

Todd Smith